UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRIAN C. DOTY                                    CIVIL ACTION

VERSUS                                           NO. 09-7018

MICHAEL J. ASTRUE, COMMISSIONER                  SECTION "D" (3)
SOCIAL SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner denying his application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA") and for supplemental security income ("SSI") benefits under Title XVI of the SSA. The matter has been fully briefed on cross-motions for summary judgment and is ripe for review.  For the following reasons, IT IS RECOMMENDED that the plaintiff's motion for summary judgment be GRANTED, the Commissioner's cross-motion be DENIED, and plaintiff's case be VACATED and REMANDED to the Administrative Law Judge for further proceedings consistent with this opinion.

## I.    BACKGROUND

Plaintiff is a 46-year old man, born on October 25, 1963.  (Adm. Rec. at 94).  He has a ninth-grade education and no special job training.  (*Id.* at 119).  His past work experience is as an ironworker and a welder.  (*Id.* at 114).  Plaintiff alleges that he suffers from orthopaedic limitations and pain in his lower extremities related to multiple accidents and the resulting surgeries.  Plaintiff

also alleges that he suffers from obesity, umbilical hernia, tracheal stenosis, osteoporosis and high blood pressure.

On November 1, 2000, plaintiff was involved in a motor vehicle accident that resulted in hospitalization at Our Lady of the Lake Hospital.  (*Id.* at 294).  After hospitalization there, plaintiff was transferred to Tulane University Hospital and Clinic for definitive care of an acetabular fracture. (*Id.*).  An examination revealed that plaintiff had right periorbital tenderness with ecchymosis, left hip tenderness, and x-rays revealed a left acetabular fracture dislocation.  (*Id.*).  On November 7, 2000, plaintiff underwent surgery.  (*Id.*).  Afterwards, plaintiff "was okay," but on the third day after the operation, his hip wounds developed a Stage II decubitus ulcer secondary to the traction apparatus used during surgery.  (*Id.*).  The wound care nurse cared for the wound daily until it was dry, and the hospital discharged plaintiff.  (*Id.*).  He was discharged with Home Health visits to monitor the decubitus and to prevent progression.  (*Id.*).  The doctor prescribed Lortab for pain. (*Id.*).

On June 6, 2005, plaintiff presented at Lallie Kemp Medical Center ("LKMC") for treatment of pain.  (*Id.* at 168).  Plaintiff was ultimately diagnosed with an umbilical hernia.  (*Id.*).

On August 23, 2006, plaintiff again presented at LKMC with complaints of chest and abdominal pain, exacerbated by lifting his arms and laughing.  (*Id.* at 165).  He was five foot 11 inches tall and weighed 267.5 pounds.  (*Id.*).  The hospital administered Demerol and Vistaril to him. (*Id.* at 166).   After the examination, the doctor noted that plaintiff had abdominal tenderness and an umbilical hernia.  (*Id.* at 163).  Plaintiff was diagnosed with an acute ventral hernia.  (*Id.* at 164).

One month later, on September 26, 2006, plaintiff again presented to LKMC, this time

complaining of a foot fungal rash and umbilical hernia pain.  (*Id.* at 159).   He was five feet 11 inches tall and weighed 268 pounds.  (*Id.*).  After examination, the doctor noted that plaintiff had red patches on top of both feet and an umbilical hernia.  (*Id.* at 159, 161).  Plaintiff was diagnosed with a fungal rash and an umbilical hernia.  (*Id.* at 162).

Less than two weeks later, plaintiff again presented at LKMC, this time complaining of 10/10 hernia pain.  (*Id.* at 155).   He was five feet 11 inches and weighed 259 pounds.  (*Id.*).  His surgical history included a blood clot with symptoms in his head and orthopedic surgery on his left knee and hip.  (*Id.*).

Three days later, plaintiff underwent I & D (Incision & Drainage) of his groin and umbilical hernias.  (*Id.* at 157-58).   On October 3, 2006, plaintiff returned to LKMC for a follow-up examination as to the I & D to his bilateral groin and umbilical hernias.  (*Id.* at 153-54).  He was five feet 11 inches, weighed 262 pounds, and his Body Mass Index ("BMI") was 36.3.  (*Id.* at 153).

Plaintiff presented at LKMC on March 6, 2007, complaining of umbilical and upper middle hernia pain.  (*Id.* at 151).  He was the same height but weighed 266 pounds, and his blood pressure was 153/91.  (*Id.*).  Blood work revealed that his glucose was high at 128.  (*Id.* at 172).  Plaintiff was then diagnosed with an umbilical and upper middle hernia.  (*Id.* at 151).

On October 31, 2007, the emergency room at the Earl K. Long Medical Clinic treated plaintiff for complaints of 7/10 left hip pain radiating into his left thigh and calf with numbness and swelling of his left leg.  (*Id.* at 207).  Plaintiff reported an open reduction with internal fixation, history of sciatica and chronic bilateral lower extremity pain.  (*Id.*).  The doctor noted that plaintiff was obese and in moderate distress, there was pain with extension of the left leg, swelling of his left

calf, tenderness to palpation and pain with passive range of motion.  (*Id.*).  Plaintiff was administered Morphine IV.  (*Id.*).  X-rays of plaintiff's left hip revealed orthopedic hardware "about the deformed left acetabulum."  (*Id.* at 210, 222).  Plaintiff was diagnosed with chronic hip pain, sciatica and umbilical hernia.  (*Id.* at 210).

On December 1, 2007, Dr. Jacob Feagans performed a consultative examination of plaintiff. (*Id.* at 177-82).  Plaintiff reported problems in his upper and lower extremities worsened by ambulation, weight bearing and any persistent movement such as sitting for long periods of time. (*Id.* at 178).  He reported a craniotomy in 1978 following intra cranial hemorrhage after a motorcycle crash.  (*Id.*).  As a result of the accident, plaintiff had knee surgery, resulting in pins placed in his knee in 1983. (*Id.*).  Plaintiff also had multiple facial surgeries after a "barrel roll" in an El Camino in 1992.  (*Id.*).  His baseline knee pain was 6/10 that exacerbated to 8/10 with ambulation and weight bearing.  (*Id.*).  This pain caused plaintiff to limit his walking to about a half of a block at a time.  (*Id.*).  The surgeries caused pain in his face with occasional headache association and pain when his jaw moved.  (*Id.*).

Plaintiff reported that in 1997, he was working as an ironworker when a piece of iron fell on him and stuck in his leg to the bone.  (*Id.* at 179).  The injury required orthopedic surgery, and plaintiff reported pain since the surgery.  (*Id.*).  As noted above, in 2000, plaintiff was involved in a motor vehicle collision.  (*Id.*).  Plaintiff suffered a shattered hip that required orthopedic surgery. (*Id.*).  After the collision, plaintiff suffered a baseline pain of 5/10, exacerbating to 8/10 when ambulating, weight bearing or standing.  (*Id.*).  He also reported lower back pain, with a baseline pain of 6/10, exacerbating to 9/10.  (*Id.*).  Plaintiff also complained of paraesthesias in his lower

4

extremities bilaterally, worse on the left, and occasional weakness in his left lower extremity.  (*Id.*).

Plaintiff reported no hypertension, diabetes or heart attacks.  (*Id.*).

Plaintiff informed Dr. Feagans that his last employer had laid him off because of days missed

due to pain.  (*Id.*).  He reported that he could dress and feed himself and could stand for 30 minutes

at a time and one hour out of eight hours.  (*Id.*).  Plaintiff noted that he could walk half of a block

on level ground, sit 15 minutes at a time and 30 minutes out of eight hours.  (*Id.*).  Plaintiff reported

that he could lift a gallon of milk and 15 gallons frequently but that he could perform no other

household chores.  (*Id.*).  Plaintiff also informed Dr. Feagans that he had been hospitalized for an

"eating accident" in 2005 at the North Oaks Medical Center.  (*Id.*).  Plaintiff's medications at the

time were Hydrocodone, Niaspan and Flexeril.  (*Id.* at 180).

Dr. Feagans noted that plaintiff was 70 inches tall, weighed 263 pounds, and his blood

pressure was 140/95.  (*Id.*).  Dr. Feagans reported that plaintiff was obese but in no acute distress,

plaintiff was alert and oriented x3.  (*Id.*).  The doctor noted that plaintiff ambulated with moderate

difficulty but that he used no assistive device.  (*Id.*).  Plaintiff was able to get on and off of the table,

up and out of the chair, and could dress and undress himself.  (*Id.*).  Plaintiff's speech was 100%

understandable.  (*Id.*).  The examination revealed that plaintiff had mild erythema bilateral lower

extremities, that he placed minimal weight on his left but needed no assistive device, and that his

gait was relatively slow.  (*Id.*).  Plaintiff was able to close a button, operate a zipper and pick up a

coin.  (*Id.*).

Dr. Feagans noted that plaintiff had

[f]ull range of motion, bilateral ankle, full range of motion cervical of spine in all

5

aspects.  Full range of motion in elbow in all aspects bilaterally.  Hip range of motion full abduction bilaterally, full adduction bilaterally, limited flexion to 60 degrees on the left, limited flexion to 30 degrees on the right, full internal rotation bilaterally, full external rotation bilaterally, full extension bilaterally.   Knee, full flexion bilaterally, full extension bilaterally.  Lumbar spine, full flexion, full extension, full lateral flexion bilaterally.   Shoulder full abduction bilaterally, full adduction bilaterally, full backward elevation bilaterally, full forward elevation bilaterally, full internal rotation bilaterally, and full external rotation bilaterally. . . .

(*Id.*).  Plaintiff's straight leg test was positive bilaterally, both supine and sitting.  (*Id.*).  Dr. Feagans specifically noted that "this was a true positive, not back pain that was elicited on both legs, sitting and supine."  (*Id.*).  Plaintiff also had moderate difficulty walking on his heels and squatting.  (*Id.*).

In his Impression/Medical Source Statement, Dr. Feagans opined that plaintiff should limit his standing, walking, sitting, lifting and carrying.  (*Id.* at 182).  Dr. Feagans reported that plaintiff has no limitations on manipulations such as reaching, handling, feeling, grasping and fingering. (*Id.*).  Dr. Feagans noted that plaintiff had no relevant visual, communicative, work place or environmental limitations.  The limitations that Dr. Feagans recommended were secondary to his multiple surgeries and multiple orthopedic problems.  (*Id.*).  Dr. Feagans opined that plaintiff should limit his standing, walking and sitting because such activities exacerbate his knee, back and generalized lower extremity pain.  (*Id.*).  Dr. Feagans opined that plaintiff's multiple surgeries limited him physically.  (*Id.*).

Two days later, plaintiff was treated at the Earl K. Long Medical Clinic for an abdominal hernia.  (*Id.* at 209).  He reported that doctors had tried to repair the hernia in 2003 but that they had aborted the operation when his oxygen level dropped.  (*Id.*).  He complained that it was difficult to swallow and weighed 266 pounds.  (*Id.*).  After examination, plaintiff had a supraumbilical hernia

6

and a chronic-looking erythema over the area. (*Id.*).

On December 19, 2007, Dr. Erol Kozdereli, a non-examining State agency consultant, completed a Physical Residual Functional Capacity Assessment. (*Id.* at 184-91). Dr. Kozdereli opined that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour work day, sit for about six hours in an eight-hour work day and had no limitations in pushing and/or pulling. (*Id.* at 185). With regard to plaintiff's postural limitations, Dr. Kozdereli reported that plaintiff could perform all of them occasionally except that plaintiff should never climb ladders, ropes or scaffold. (*Id.* at 186). Dr. Kozdereli found that plaintiff had no manipulative, visual, communicative or environmental limitations. (*Id.* at 187-88).

On January 14, 2008, plaintiff again presented at the Earl K. Long Medical Clinic for treatment for his hernia. (*Id.* at 208). Plaintiff again complained of difficulty in swallowing. (*Id.*). Three months later, on April 24, 2008, plaintiff returned to the Earl K. Long Medical Center with complaints of hernia pain and chronic back and leg pain. (*Id.* at 207). His blood pressure was 144/107, he was 71 inches tall, and he weighed 254 pounds. (*Id.*). Plaintiff was diagnosed with high blood pressure, a symptomatic umbilical hernia, dyslipidemia, chronic back and leg pain, obesity, esophageal stricture and osteoporosis. (*Id.*). He was prescribed Crestor, Accuretic and Toprol, and a surgical consult was scheduled on May 22, 2008 for his hernia. (*Id.*).

Ten days before the consult, however, plaintiff presented at the Earl K. Long Medical Clinic for hernia repair. (*Id.* at 205). Plaintiff reported that he had a history of prolonged intubation after an earlier motor vehicle accident, that he could not be intubated during an earlier attempt to repair

the hernia, and that he had been told at LKMC that he has stenosis of his trachea/esophagus.  (*Id.*).

That same day, plaintiff was treated at the clinic.  Plaintiff reported that he had been unable to obtain

medication for treatment of his high blood pressure.  (*Id.* at 206).  Although unclear from the record,

it appears that this qualified plaintiff for services at the clinic.  (*Id.*).  He was diagnosed with high

blood pressure and prescribed Toprol, Accuretic and Crestor.  (*Id.*).

On May 29, 2008, a CT scan of plaintiff's soft tissue of his neck revealed a few small sub

centimeter nodes in his left posterior cervical chain.  (*Id.* at 219).  Otherwise, the CT scan revealed

a normal study.  (*Id.*).  On June 9, 2008, plaintiff presented at the clinic for a follow-up of the CT

scan.  (*Id.* at 204).  He was referred to ENT for an evaluation of his tracheal stenosis, after which

an umbilical hernia repair would be scheduled, and a more detailed CT was scheduled for further

evaluation.  (*Id.*).  On June 26, 2008, plaintiff returned to the clinic and underwent a CT scan of the

soft tissue of the neck that revealed a tracheal stenosis at the level of the resinoid cartilage.  (*Id.* at

217).

On August 6, 2008, the clinic diagnosed plaintiff with tracheal stenosis, umbilical hernia,

osteoporosis, chronic back and leg pain and a hip injury.  (*Id.* at 196).  He was prescribed Lortab,

Accuretic, Crestor, Carisprodol and Toprol.  (*Id.* at 197).

Plaintiff filed concurrent DIB and SSI applications on October 2, 2007 in which he alleged

an inability to work beginning July 1, 2005.  (*Id.* at 94-96, 102-04, 121-29).  On December 19, 2007,

the State Disability Determination Services denied plaintiff's applications.  (*Id.* at 49-50).  Pursuant

to plaintiff's request, Administrative Law Judge ("ALJ") Jean R. Kerns conducted a *de novo* hearing

on January 27, 2009.  (*Id.* at 26-48).

8

On April 9, 2009, the ALJ issued an unfavorable decision.  (*Id.* at 18-25).  The ALJ determined that plaintiff had severe impairments due to status-post multiple fractures and a femur/open reduction internal fixation of the left hip but that he did not have an impairment or combination of impairments that met a listing for presumptive disability.  (*Id.* at 20-21).  The ALJ found that plaintiff had the RFC to perform a limited range of sedentary work.  (*Id.* at 21).  Relying on the testimony of a vocational expert, the ALJ determined that plaintiff was functionally capable of performing a significant number of jobs that exist in the national economy.  (*Id.* at 24).  The Appeals Council denied review, and the ALJ's decision thus became the final decision of the Commissioner.  (*Id.* at 1-3).

## II.    STANDARD OF REVIEW

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards to evaluate the evidence.  *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991). If the Commissioner's findings are supported by substantial evidence, this Court must affirm them. *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401(1971); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).   It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).  A finding of no substantial

evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *See Boyd v. Apfel*, 239 F.3d  698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, re-weigh the evidence, or substitute its own judgment for that of the Commissioner.  *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. (1992).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Carey,* 230 F.3d at 135.  Any of the Commissioner's findings of fact that are supported by substantial evidence are conclusive.  *Ripley*, 67 F.3d at 555.  Despite this Court's limited function on review, the Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.   *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992);  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990).

## III.    ENTITLEMENT TO BENEFITS UNDER THE ACT

To be considered disabled and eligible for disability benefits under the Act, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant, such as the plaintiff, is considered disabled only if his physical or mental impairment is so severe that he is unable to do not only his previous work, but cannot, considering his age, education and work experience, participate in any other kind of

substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which he lives, whether a specific job vacancy exists, or whether he would be hired if he applied for work.  42 U.S.C. § 1382(a)(3)(B).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 - 404.1599 & Appendices, §§ 416.901 t - 416.988 (1995).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  *Id.* §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994).

In *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001), the Fifth Circuit restated the five-step procedure to make a disability determination under the Social Security Act:

> The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

11

*Shave*, 239 F.3d at 594 (quoting *Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)).  If the ALJ determines that a plaintiff is not disabled under Step V of the five-part test, the ALJ must establish that the claimant has a "residual functional capacity," given the claimant's age, education, and past work experience, to perform other work available in the national economy.  *Leggett v. Chater*, 67 F.3d 558, 564 n.11 (5th Cir. 1995).  Step V also requires the Commissioner to use the medical-vocational guidelines to make his disability determination.  *Id.*

The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995).  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  *Id*.

## IV.    ISSUES ON APPEAL

There are two issues on appeal:

(1)    Whether substantial evidence supports the ALJ's finding that plaintiff's impairments do not meet Listing 1.02 and comports with the legal standards of the 1.00 Musculoskeletal Listings.

(2)    Whether the ALJ properly evaluated plaintiff's credibility.

## V.  ANALYSIS

### 1.    Whether substantial evidence supports the ALJ's finding that plaintiff's impairments do not meet Listing 1.02 and comports with the legal standards of the 1.00 Musculoskeletal Listings.

Plaintiff argues that the ALJ erred when she failed to perform any Listing evaluation.  The

12

regulations (and the case law in this circuit) require the ALJ to determine whether an impairment or a combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

The well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the "disabling effect of each of the claimant's ailments" and the "combined effect of all of these impairments." *Dellolio v. Heckler*, 705 F.2d 123, 128 (5th Cir. 1983); *see also Ferguson v. Schweiker*, 641 F.2d 243, 250 n.9 (5th Cir. 1981). To determine whether a claimant's physical or mental impairments are of a sufficient medical severity as could be the basis of eligibility under the law, the ALJ is required to consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *See* 20 C.F.R. § 404.1523; *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992); *Sewell v. Heckler*, 764 F.2d 291, 294 (5th Cir. 1985); *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984); *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984). If the ALJ finds a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523. Finally, it is clear that the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports her position. *See Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F.S upp. 1364, 1373 (W.D. Tex. 1993).

13

Here, the ALJ determined that plaintiff has at least two severe impairments: Status-Post multiple fractures and a femur/open reduction internal fixation of the left hip. (Adm. Rec. at 20). The ALJ then determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1:

> Although the severity of the claimant's injuries met the listing at the time of his accident in 2000, he medically improved and was able to return to work in 2005 and 2005 [sic]. Therefore the alleged impairments do not meet the listing for 12 months based on the record and medical improvement after his accident.

> Though the claimant has severe impairments who do impose some limitations none [sic], when considered both singly and in combination, meet or equal the criteria of a listed impairment. This is fully consistent with the claimant's medical records.

(*Id.* at 21).

The Court finds that substantial evidence does not support the ALJ's determination that "the alleged impairments do not meet the listing for 12 months. . . ." (*Id.*). While the Court recognizes that plaintiff testified that he returned to work for five or six months in 2004 or 2005 (*id.* at 36), the ALJ simply assumed that the accident in 2000 was the time from which the 12-month deadline began to run. The ALJ cites no law or even evidence to support such a conclusion. Indeed, the evidence before the ALJ revealed that plaintiff was hospitalized in October 2007 for severe pain related to his hip injury and surgery. (*Id.* at 210). In addition, in December 2007, even Dr. Feagans opined that plaintiff had obvious evidence of multiple surgeries in the past and was "very physically limited" from the multiple surgeries. Plaintiff claims a disability onset date of July 1, 2005, and the evidence reveals that plaintiff has not been employed since that date. The ALJ gives no reason and

14

cites to no evidence to support her random choice of 2000 as the date from which the 12-month period began to ran.  The Court renders no opinion from what date the 12-month period begins to run.  The Court only finds that neither substantial evidence nor any cited case law supports the ALJ's decision to run the 12-month period from that date given the evidence in the record that the Court outlined above.  The Court will accordingly remand this suit to the ALJ to support her findings with either case law or substantial evidence.

Apparently because she found that plaintiff had no listed impairments – as that term is defined in the regulations – the ALJ determined that plaintiff could have no combination of listings: "Though the claimant has severe impairments who do impose some limitations none [sic], when considered both singly and in combination, meet or equal the criteria of a listed impairment."  (*Id.* at 21).  As noted above, the well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the "disabling effect of each of the claimant's ailments" and the "combined effect of all of these impairments."  *Dellolio*, 705 F.2d at 128;  *see also Ferguson v. Schweiker*, 641 F.2d at 250 n.9.  The ALJ performed no such evaluation.  Indeed, simply stating the rule in conclusory fashion does not make it so.  In short, the Court simply does not have enough with which to work.  Should the ALJ determine on remand that plaintiff has a listed impairment, the ALJ shall analyze both the disabling effect of each of the claimant's ailments and the combined effect of all of these impairments.[1]

---

[1]    Because the Court remands on this ground, the Court does not address whether the ALJ properly analyzed plaintiff's credibility.

## VI.  CONCLUSION

The Commissioner has failed to demonstrate that substantial evidence supports the ALJ's determination as outlined above.  Accordingly,

**IT IS RECOMMENDED** that the plaintiff's Motion for Summary Judgment be GRANTED, the Commissioner's Cross-Motion be DENIED and that the ALJ's opinion be VACATED and REMANDED for further proceedings consistent with this opinion.

### NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within fourteen (14) days after being served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b). A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 30th day of September, 2010.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**